■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH TORRES, Appellant.—Judgment, Supreme Court, New York County (Arnold Fraiman, J., at suppression hearing,

trial and sentence), rendered September 4, 1984, which convicted defendant, after a jury trial, of manslaughter in the first degree (Penal Law § 125.20 [1]) and sentenced him to an indeterminate prison term of from 4 to 12 years, unanimously reversed, upon the law and facts, and the matter remanded for a new trial from which the written statement made by the defendant to the police is to be excluded. Prior to the new trial, a hearing should be held on whether the second, videotaped statement should be excluded.

On December 21, 1983 at approximately 4:00 A.M., a triple homicide occurred at 601 West 162nd Street, Manhattan. The police found the bodies of Rufino Garcia (Rubio) and Daniel Vargas in the basement of that address, and the body of Valerio Guzman on the sidewalk just outside the building. Defendant Joseph Torres, one of the sons of the superintendent who lived in the building, was convicted after a jury trial of manslaughter in the first degree for the killing of Daniel Vargas. On appeal defendant argues that the incriminating statements he made to the police, one a signed written statement and the other a videotaped statement, should have been suppressed because (1) the police failed to give him his *Miranda* warnings in a timely fashion and (2) he did not knowingly or intelligently waive his *Miranda* rights. Defendant also asserts that he was denied the effective assistance of counsel.

In a *Huntley* hearing with respect to the first, written statement, held in June 1984, the following evidence was elicited:

Detective Edmund Vogel arrived at the crime scene at approximately 5:00 A.M. on December 21, 1983. He spoke with defendant who had reported the homicides to 911. Defendant told him that a tenant in apartment 1E of the building awakened him and told him of hearing shots emanating from the basement. He went to investigate and found the bodies of Rubio, a tenant, and a second, unknown man in the basement. Thereafter, he called police from apartment 1E.

Defendant accompanied Detective Vogel to the basement where he identified one of the bodies as that of Rubio. He also told the detective that he had seen Rubio earlier in the evening at a bar.

At 10:30 A.M. the same day, defendant and his brother Peter Torres arrived at the precinct, going there at the request of Detective Edwin Cruz. Said Detective Cruz requested their presence in response to a statement by Bejica Pena, tenant of

apartment 1E, that she had reported hearing shots to "one of the super's sons." Each brother was taken to a separate interviewing room.

At the precinct, defendant told Detective Cruz that Ms. Pena had come to his door and told him of hearing shots. He went to his brother's room and both proceeded to the basement where they discovered the bodies. His brother, Peter Torres, however, told Detective Cruz that his mother awakened him because of shots heard and that he went to investigate.

A further discrepancy arose when Ms. Pena told Detective Cruz at the precinct that the defendant had requested that she tell the police the story of hearing the shots and alerting him. She claimed that the true version was that she, Peter Torres and another individual, Frank Delacruz, were in apartment 1E when defendant came in. Peter and defendant exchanged words and both left. Detective Cruz was also notified by Ms. Pena that defendant had psychological problems. When confronted with Ms. Pena's new version of events, defendant stuck to his story. He also confirmed that he suffered from psychological problems.

Throughout this period the police maintained that defendant was free to leave. Testimony revealed, however, that defendant was asked to remain and was not told that the questioning was over and that he was free to go home.

At 9:00 P.M. on December 21, 1983, Peter Torres changed his version of what happened. He told detectives that he was in Ms. Pena's apartment when his brother, the defendant, came in and told him that he (defendant) had just had an argument with Rubio and another man concerning drug dealing in the basement. He went down and discovered two bodies. He then helped defendant remove a scale from the basement to the roof so that the police would not think the shooting was drug related. Peter signed a written statement to this effect. Upon investigation, the police recovered a scale from the roof of 601 West 162nd Street. At approximately 10:00 P.M. the police ordered dinner for defendant. At about 11:00 P.M., defendant, when confronted with his brother's new version and the recovered scale, maintained his original story.

At 12:30 A.M. of the next day, December 22, 1983, at the urging of his brother who was cooperating with the police, defendant agreed to make a statement. At this point, approximately 14 hours after defendant arrived at the precinct, the police read him his *Miranda* rights for the first time. Thereaf-

ter, defendant made a statement which was written down by Detective Cruz. He stated that at about 3:30 A.M. on the morning of the shooting, he overheard an argument about money coming from Rubio's basement apartment. He went to the basement and there observed Rubio's body on the floor with another man leaning over him, going through his pockets. Defendant hit the man from behind with a glass. The man dropped a gun he was carrying and in the ensuing struggle, defendant shot him. Defendant panicked and returned to his room. After about a half hour, Peter came to his room to report the gunshots. The two went to the basement and Joseph told Peter what had happened. They hid a scale taken from the apartment on the roof and then returned to Ms. Pena's apartment to call the police. After reading over the statement and checking for inaccuracies, defendant signed it at about 2:00 A.M. on December 22, 1983. Defendant was left to sleep handcuffed to several chairs. At about 10:00 A.M. on the same day, after renewed *Miranda* warnings, defendant made a videotaped statement containing the same account. Following the hearing, the trial court denied the motion to suppress the written statement, finding that despite the long period of time defendant had been in the precinct, there was nothing to show that his statement was not voluntarily given.

The *Huntley* hearing held in this case was pursuant to a motion to suppress the written statement made around 12:30 A.M. on December 22, 1983. No separate *Huntley* hearing was held with respect to the videotaped statement taken around 10:00 A.M. on December 22, 1983. Prior to the *Huntley* hearing, the court made several rulings with respect to the confessions which are relevant here. They are as follows:

1. The *Huntley* hearing would proceed only with respect to the written statement and not the videotaped statement.

2. In the interests of fairness, if the court determined that the written statement was admissible, it would "require him [the District Attorney] also to use the videotape confession made by the defendant if it is the defense counsel's wish that that be used."

3. If the court suppressed the written statement, it would also suppress the videotaped statement "on the ground that it, at that point the cat was out of the bag, the horse was out of the stable, choose whatever you wish, but in any event the videotape statement, which was essentially the same as the written statement given by the defendant clearly resulted by reason of the defendant already having given a written confession to the police."

4. If the court ruled that the written statement was admissible but the defendant still wished to suppress the videotaped statement, a *Huntley* hearing would be held as to the videotaped statement. (Although the transcript refers to a new hearing on the written statement rather than the videotaped statement, it is clear from the context that the court was referring to a *Huntley* hearing on the videotaped statement if the court denied suppression of the written statement but the defendant still wished to challenge the admission of the videotaped statement.)

Following the *Huntley* hearing, the court denied the defendant's motion to suppress the written statement and further directed that the videotaped statement be admitted as well. The court ruled that while the defendant was "in custody" at "some point during the afternoon of December 21st", had been at the station for some 14 hours before he made an oral statement which was incorporated into a written statement, and had a history of mental illness, the statement "was voluntarily made after the defendant was fully apprised of his rights." The court noted further that it was not passing upon the videotaped statement but noted its prehearing ruling that if the written statement was used, the videotaped statement also had to be used. Finally, the court noted that if it had "granted the motion to suppress the written statement the videotape statement would have been suppressed as a matter of course inasmuch as it is an *[sic]* reiteration of the written statement".

*Miranda* warnings, to be effective, must precede the subjection of a defendant to questioning. "Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning." *(People v Chapple,* 38 NY2d 112, 115 [1975]; *see also, People v Bethea,* 67 NY2d 364 [1986].) In *Chapple* the Court of Appeals suppressed defendant's post-*Miranda* statements as involuntary. There, defendant had been subjected to such continuous custodial interrogation prior to the warnings that the subsequent giving of *Miranda* warnings was insufficient to protect defendant's right in the absence of a definite, pronounced break in the questioning.

In the case at bar, the People concede that under the rule enunciated in *Chapple (supra)* and reaffirmed in *Bethea (supra),* defendant's first written statement was inadmissible as the product of a custodial interrogation without timely *Miranda* warnings. This view is clearly supported by the evi-

dence which established that defendant was subjected to custodial interrogation for a prolonged period of time prior to receiving his *Miranda* warnings, and under those circumstances the waiver of those rights could not be considered.

The People argue, however, that the seven-hour break between the defendant's first statement and second videotaped statement attenuated the taint of the inadmissible first statement by returning the defendant to "the status of one who is not under the influence of questioning." *(People v Chapple, supra,* at 115.) The defendant contends that the written and videotaped statements are related and both should be suppressed.

In view of the fact that the *Huntley* hearing was held only with respect to the first, written statement, a further *Huntley* hearing should be held with respect to the videotaped statement. While the District Attorney contends that no necessity exists for a hearing on the videotaped statement, the defendant contends that the present record does not permit a conclusion in favor of or against suppression. We believe that a hearing is required.

In view of our decision, we do not address the issue of the ineffective assistance of counsel. Concur—Sandler, J. P., Carro, Kassal, Ellerin and Smith, JJ.