[963 NYS2d 48]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TERRELL DAVIS, Appellant.

First Department, April 4, 2013

**APPEARANCES OF COUNSEL**

*Steven Banks, The Legal Aid Society*, New York City (*Katheryne M. Martone* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Sylvia Wertheimer* and *Eleanor J. Ostrow* of counsel), for respondent.

**OPINION OF THE COURT**

RENWICK, J.

Prior to pleading guilty, defendant moved to suppress a gun, recovered from his pocket, and videotaped statements he made to the prosecution as fruits of an unlawful seizure. He also

moved to suppress the statements as obtained in violation of his *Miranda* rights. We conclude that the facts disclosed in the record were such as to warrant a person of reasonable caution to believe that defendant was reaching for a weapon when the arresting officer grabbed his arm. We also find that defendant's videotaped statements were not suppressible, notwithstanding the suppression of prior written statements made more than seven hours earlier to police officers, because the videotaped statements were attenuated by a "definite, pronounced break in the interrogation" (*People v Chapple*, 38 NY2d 112, 115 [1975]).

## Procedural and Factual Background

The facts developed at the suppression hearing were based upon the testimony of one of the arresting officers, Officer John Facchini, and the testimony of one of the interrogating officers, Detective Conrad Crump. Defendant did not testify or present any other evidence at the suppression hearing.

According to Officer Facchini, on November 27, 2005, at approximately 12:05 a.m., he and his partner were on patrol in the lobby of the Rangel Houses, a public housing project. Facchini heard two gunshots, about four seconds apart, from the direction of another public housing building, the Polo Grounds, which is located about 80-to-100 yards away from the Rangel Houses. About 60 seconds after hearing the shots, Facchini saw "[t]wo males [later identified as defendant and Jeffrey Graves] with hoods and . . . their hands in their pockets" going from the entrance of the Polo Grounds toward the Rangel Houses. Reportedly, defendant and Graves were walking "fast" and "with a purpose," not "calmly."

The officers approached defendant and Graves. No one else was in the area. Facchini spoke with defendant while his partner spoke with Graves. After Facchini identified himself as a police officer, he asked defendant how he was doing. Defendant said, "Good." Facchini asked if he and Graves were "coming from the Polo Grounds"; defendant stated that they were. Facchini asked, "Did you hear the two gunshots?" Defendant answered, "Yes, that's why we are leaving." Facchini asked defendant if they had seen anybody, and defendant stated that they had not. Facchini asked defendant if he "had any ID on him," and defendant said, "Yes." Immediately after asking that question, Officer Facchini also asked defendant if he had "any weapons or anything like that on [him,]" and defendant responded, "No."

When Facchini saw that defendant began to place his hand in his back pocket, Facchini reacted by grabbing defendant's arm.

Officer Facchini explained that, given that he had recently heard gunshots in the area, he wanted to frisk defendant before allowing him to reach in his pockets. Facchini attempted to pat down defendant's waistband to check for weapons, but before he could do so, defendant used both of his hands to push Facchini away. Facchini then grabbed defendant somewhere on his upper body. Defendant struggled to escape and ran into a fence located about four feet behind them. This caused Facchini to strike the fence too. They fell to the ground, with defendant lying on his stomach and Facchini on top of defendant's back. At that point, Facchini saw the handle of a firearm sticking out of defendant's back pocket. Facchini pulled the gun out of defendant's pocket and placed him in handcuffs. Facchini unloaded the gun, which felt warm, and discovered it had three cartridges and two empty shell casings. Meanwhile, Facchini's partner arrested Graves. Soon thereafter, Facchini learned that a dead body with gunshot wounds had been found near the Polo Grounds.

At approximately 12:45 a.m., Facchini and his partner transported defendant and Graves to the police station. Defendant was placed in room 219 for interrogation.

Detective Crump, the "lead investigating officer," was the only witness who testified about the interrogation. Crump testified that during the interview, he provided defendant with cigarettes and never threatened or made any promises to him. Crump asked defendant what happened between him and the shooting victim, and why he had the gun. Defendant initially denied knowing anything about the shooting. Instead, he explained that he had found the gun somewhere, picked it up, put it in his pocket, and planned to give it to the police. Crump repeatedly asked defendant if he was "sure" that he did not shoot someone with the gun, and defendant responded that he did not.

Detective Crump did not believe defendant's account, and temporarily left the room. When he returned, he told defendant that the shooting might have been "an accident," adding that Crump had been informed by defendant's uncle that defendant and the victim were "friends." (They were actually cousins.) Defendant then admitted that he had been "playing with the gun" when it suddenly fired and shot the victim in the head. Crump then asked defendant to write a statement.

At the suppression hearing, Crump initially testified that he read defendant his *Miranda* rights "[b]efore [he] spoke with the defendant," which was "approximately about . . . 2:00 [a.m.]"

However, he later testified that he read the *Miranda* rights from a sheet which was signed by defendant with the time marked "3:45 [a.m.]" When the court asked Crump about this discrepancy, he responded that 3:45 a.m. was "the time I actually started speaking to him about interviewing him and I Mirandized him first before I started speaking to him and g[o]t a statement from him." Defendant wrote a statement in which he crossed out some words, and then wrote another statement, which was substantially identical to, but neater than, the first. On both statements, Crump wrote the approximate time as 3:50 a.m. According to the second written statement, on the night of the shooting, defendant and his cousin, Dickey, had been drinking alcohol, smoking marijuana, and having "mad fun" with "a couple of ladies." Graves was also present. Defendant was "drunk and high." The group headed for a friend's apartment, planning to have an "orgy." They stopped at two stores to buy liquor and juice. Then, Dickey asked defendant if he would like to "bust some shots in the air." Defendant agreed, and followed Dickey's instructions to pull a gun from the purse of one of their friends. Defendant started "playing" with the gun, but did not know how to use it. One of the women shouted, "Stop playing!" As defendant was attempting to fire a shot into the air, "the gun went off twice by accident." At first Dickey appeared to be ducking, but then he fell to the ground. Realizing that he had shot Dickey, defendant started "walking fast" away from the area, accompanied by Graves. Two police officers approached, "grabbed" them, retrieved the gun, told them to get on the floor, and arrested them. Defendant added that he loved Dickey and did not mean to shoot him.

Crump further testified that Detectives Stewart and Imbornoni also spoke with defendant, sometime after Crump had read defendant his *Miranda* rights. Crump did not know when Stewart or Imbornoni arrived at the station, when they spoke with defendant, or the length or content of those conversations, other than that they were about the shooting. Crump added, "We was [sic] in the room till approximately 5:45 [a.m.]"

Seven hours later, defendant agreed to provide a videotaped statement to the prosecutor, which began shortly after 1:00 p.m. Assistant District Attorney (ADA) O'Connell began by introducing herself and another ADA in the room. The ADA also mentioned that defendant already knew Crump and Stewart, who were seated near defendant in the small room. Prior to any interrogation, the ADA verbally administered the *Miranda*

warnings. When asked if he was willing to answer questions, defendant responded, "Yes, I don't have any problem," and acknowledged that he had previously signed a written waiver of his *Miranda* rights. Before the interrogation began, defendant asked the ADAs for their business cards, which they handed to him.

Defendant began to describe the incident on videotape, beginning at 1:05 p.m. in response to the ADA's questions. The videotaped statement was more detailed than, but generally consistent with, his handwritten statement. At various points in the video, defendant reenacted the moment when he shot Dickey, as Crump stood up from his chair and played the role of Dickey, demonstrating his distance of four-to-five feet from defendant at the time as well as how he turned around and fell when he was shot. After the ADA told defendant that this account was inconsistent with a medical examiner's report on Dickey, defendant again reenacted the moment, but indicated that the barrel of his gun was only about eight inches away from Dickey's head. Then, the ADA told defendant, "So, now, earlier, when you were talking to the detectives, that isn't what you told them. You told the female detective, [Imbornoni] . . . that you were probably . . . three yards away from [Dickey] when this happened." Defendant, gesturing toward Crump, responded that he had told Kim Imbornoni the same thing he had told Crump. The ADA then asked, "Well, what about when Detective Stewart was talking to you? That's Detective Stewart right there." Defendant admitted that Stewart told him that his story didn't "match," but added, "[T]hat's what happened."

The ADA then asked defendant why his reenactments during the videotaped interrogation were inconsistent with each other. Defendant responded, "Because everything happened so fast." About 10 minutes later, defendant stated, "I intentionally pulled the trigger. I didn't intentionally . . . hit him." About 45 minutes into the video, Detective Stewart repeated defendant's earlier answer (during the videotaped interrogation) that the reason he fled the area after shooting Dickey was that he had the gun on his person. Defendant nodded affirmatively. Detective Stewart then asked, "Do you remember telling me earlier [referring to the prior interrogation] when I spoke to you, that you had ample time to get rid of the gun before the police arrrived." Defendant interjected, "Yes, if I had intentionally wanted to shoot him, I had ample time to get rid of the gun. I could have run the other way." Stewart asked why he did not do

just that, and defendant stated that he was stopped by the police before he could do so. Stewart asked only one other question later in the interrogation.

Almost an hour into the video, the ADA showed defendant his two handwritten statements. She asked him how long it took him to write each one, and defendant said that he wrote both of them within about 5 to 10 minutes. Defendant admitted that he initially did not want to be videotaped, but then decided to put "everything" on the record, since he was "trying to cooperate." Defendant also stated: "I know I'm going to do jail time because what I did was wrong. I'm wrong. They just told me to talk to you, so that's what I'm doing."

The court denied the motion to suppress the gun. The court found that the arresting officer properly exercised the common-law right to stop and question defendant. The court further found that the officer's action of grabbing defendant's arm as he was reaching for his back pocket was a reasonable precautionary measure to protect the officers' safety. The court also found that once the officer discovered the gun as a result of seeing its handle sticking out of defendant's pocket following their tussle, the officer had probable cause to seize the gun and arrest defendant.

The court granted the motion to suppress defendant's written statements as tainted by the immediately preceding interrogation without *Miranda* warnings. Preliminarily, the court found "incomprehensible" Crump's claim that he gave defendant *Miranda* warnings at 2:00 a.m., but did not start interrogating him until 3:45 a.m. as indicated in the sheet defendant signed waiving his *Miranda* rights. Thus, the court resolved the inconsistency by finding that "defendant did not waive his *Miranda* rights until 3:45 a.m.," which was more than two hours after the interrogation started, and immediately before defendant wrote the confession. The court found that "there was no break between the oral statement that [defendant] gave in response to Crump's questions and the written statement that he began at 3:50 [a.m.]." The court also noted that after the *Miranda* warnings were administered, defendant remained in the same room and continued to be interrogated by Crump, who had also been the primary interrogator before the warnings were given.

The court, however, denied the motion to suppress the videotaped interrogation, finding that it was attenuated from the prior *Miranda* violations. The court noted that this interrogation was led by the ADA who administered new *Miranda*

warnings at the outset; further, the ADA did not refer to defendant's written statement until the very end of her questioning. The court also noted that while two officers, who had previously interrogated defendant, were present, their participation was infrequent and resulted in merely tangential statements. Finally, the court noted that one of the officers merely "made two or three isolated references to discussions between" defendant and the interrogating detectives.

### Plea and Sentence

After the adverse suppression rulings, defendant pleaded guilty to manslaughter in the first degree and criminal possession of a weapon in the third degree, in full satisfaction of the indictment. In accordance with the plea agreement, he was sentenced, as a second violent felony offender, to an aggregate term of 32 years, to run concurrently with a sentence imposed on his conviction in a different case. This appeal ensued.

### Discussion

■ Defendant contends that Supreme Court erred when it refused to suppress the gun and the videotaped statement. We find that the court properly denied defendant's motion to suppress the firearm recovered from his person as the fruit of an illegal seizure. At the inception, the arresting officer had a founded suspicion of criminality when, immediately after he heard gunshots, he saw defendant and another man walking quickly away from the area from which the shots emanated. This was a deserted area and no one else was present. Thus, the officer properly exercised the common-law right to inquire (*see People v De Bour*, 40 NY2d 210, 223 [1976]; *People v Forelli*, 58 AD2d 76 [2d Dept 1977]), including the right to ask about the presence of any weapons (*see People v Ward*, 22 AD3d 368 [1st Dept 2005], *lv denied* 6 NY3d 782 [2006]).

Moreover, when defendant reached for his back pocket, the officer was justified in grabbing defendant's arm as a minimal self-protective measure (*see e.g. People v Wyatt*, 14 AD3d 441 [1st Dept 2005], *lv denied* 4 NY3d 837 [2005]; *People v Campbell*, 293 AD2d 396 [1st Dept 2002], *lv denied* 98 NY2d 695 [2002]; *People v Ortiz*, 186 AD2d 505 [1st Dept 1992], *lv denied* 81 NY2d 845 [1993]). It was objectively reasonable, under all the circumstances, for the officer to be concerned that defendant might be reaching for a weapon rather than producing identification. Defendant then pushed the officer, leading to a

struggle in which defendant fell to the ground. This revealed the handle of a weapon, at which point the officer had probable cause to lawfully seize and arrest defendant.

██ We also find unpersuasive defendant's argument that the court erred in denying his request to suppress the videotaped statement as not sufficiently attenuated from the initial unlawful questioning. When, "as part of a continuous chain of events," a defendant is subjected to custodial interrogation without *Miranda* warnings, any statements made in response, as well as any additional statements made after the warnings are administered and questioning resumes, must be suppressed (*People v Bethea*, 67 NY2d 364, 366, 368 [1986]; *see Chapple*, 38 NY2d at 114-115). If, however, "there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning," his statements in answer to renewed questioning after he has received the warnings and waived his constitutional rights may be admitted (*Chapple* at 115).

In *People v Paulman* (5 NY3d 122 [2005]), the Court of Appeals delineated the various factors to be considered in determining whether there is a sufficiently " 'definite, pronounced break in the interrogation' " to remove the taint from a prior *Miranda* violation (*id.* at 131, quoting *Chapple*, 38 NY2d at 115). Those factors include:

> "the time differential between the *Miranda* violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the *Miranda* violation, such as the extent of the improper questioning; and whether, prior to the *Miranda* violation, defendant had indicated a willingness to speak to police" (*Paulman* at 130-131).

While "[n]o one factor is determinative and each case must be viewed on its unique facts" (*id.* at 131), the Court of Appeals has stated that the purpose of the inquiry is to assess whether "there was a sufficiently 'definite, pronounced break in the interrogation' to dissipate the taint from the *Miranda* violation" (*id.*, quoting *Chapple*, 38 NY2d at 115).

Such a definite, pronounced break in the interrogation occurred in this case (*see e.g. People v Bastidas*, 67 NY2d 1006,

1007 [1986]; *People v Rodriguez,* 49 AD3d 431, 433 [1st Dept 2008], *lv denied* 10 NY3d 964 [2008]; *People v Vientos,* 164 AD2d 122, 127 [1st Dept 1990], *affd* 79 NY2d 771 [1991]; *People v Kern,* 149 AD2d 187 [2d Dept 1989], *affd* 75 NY2d 638 [1990]). Preliminarily, it should be noted that the failure to provide *Miranda* warnings was the only reason to suppress the post-*Miranda* written statements. There is no claim by defendant nor a factual finding by the court that the detectives had engaged in any coercive tactics before or after the administration of the initial *Miranda* warnings.

Moreover, a significant amount of time passed between the *Miranda* violation and the videotaped statement. The court found that the pre-*Miranda* two-hour questioning by Detective Crump ended at or about 3:45 a.m. on November 27, 2005. At that point, Detective Crump advised defendant of his *Miranda* rights and defendant waived them. Defendant then made written statements consistent with his pre-*Miranda* oral statements. The court found that such written statements, followed by some sporadic questioning ending at 5:45 a.m., were not sufficiently attenuated by the *Miranda* warnings. The ADA did not began to interview defendant until 1:00 p.m. Therefore, by the time defendant spoke to the ADA, at least seven hours had elapsed since the police questioning had ended at 5:45 a.m.

We agree with the court that this seven-hour intervening break and the re-administration of *Miranda* warnings attenuated any taint of the suppressed statements, returning defendant to the "status of one who is not under the influence of questioning" (*Chapple,* 38 NY2d at 115; *see also People v Malaussena,* 10 NY3d 904, 905 [2008]; *People v Santos,* 3 AD3d 317 [1st Dept 2004], *lv denied* 2 NY3d 746 [2004]; *People v Rodriguez,* 49 AD3d at 433; *People v Nova,* 198 AD2d 193, 195 [1st Dept 1993], *lv denied* 83 NY2d 808 [1994]; *People v Vientos,* 164 AD2d at 127).

Contrary to defendant's allegations, the record supports the court's factual findings that the videotaped statement was preceded by a seven-hour break in questioning. As indicated, Detective Crump testified that defendant completed his written statement at or about 3:50 a.m. Crump also testified that two other detectives spoke with defendant, some time after Crump had read defendant his *Miranda* rights. Although Crump vaguely stated that "[w]e was [sic] in the [interrogation] room till approximately 5:45 [a.m.]," the court reasonably inferred that he meant *all* interrogators left the room at that point, and

that an interrogation did not resume until the videotape started. There is no basis for disturbing this credibility determination, which is supported by the record (*see People v Prochilo*, 41 NY2d 759, 761 [1977]).

Furthermore, while all interviews took place in the same location (interrogation room), the prolonged break and re-administration of *Miranda* warnings clearly signaled a change in the nature of the interrogation (*see People v Morales*, 279 AD2d 362 [1st Dept 2001], *lv denied* 96 NY2d 803 [2001]; *People v Hotchkiss*, 260 AD2d 241, 241-242 [1st Dept 1999], *lv denied* 93 NY2d 1003 [1999]; *People v Dunkley*, 200 AD2d 499 [1st Dept 1994], *lv denied* 83 NY2d 871 [1994]; *People v Nova*, 198 AD2d at 195). In fact, defendant's demeanor at the inception of the interview reflected his willingness to participate in the ADA interview. At the outset, defendant asked for the prosecutors' business cards. In addition, in response to the prosecutor's inquiry, defendant stated that everyone had treated him well at the precinct and that there had been "no problem." The ADA read him his *Miranda* rights—including his right to remain silent—and defendant waived them. Defendant acknowledged that the police previously had read him his *Miranda* rights, and he waived those rights. When the ADA asked him whether he was willing to answer questions, defendant responded, "Yes, I don't have any problem." That calm demeanor and willingness to talk after the prolonged break and re-administration of *Miranda* warnings show that the decision to provide information did not flow from the initial impropriety (*see People v Rodriguez*, 55 AD3d 351, 352 [1st Dept 2008], *lv denied* 12 NY3d 762 [2009] [fact that the defendant "had demonstrated an unqualified desire to speak to the detective" militated in favor of a finding of attenuation]; *cf. Paulman*, 5 NY3d at 131 [Court found significant that, "from the moment defendant encountered the police," he had "exhibited a willingness" to speak to them]).

Nor are we persuaded that there was no break in defendant's custodial circumstances because the police officers who conducted the improper interrogation were present and participated in the videotaped investigation. On the contrary, the court's determination that the police officer's involvement in the videotaped interrogation was "minimal" is supported by the record. In fact, Detective Crump, who had been the lead investigator, did not ask even a single question during the videotaped interview. For his part, Detective Stewart said noth-

ing until after 45 minutes had elapsed, when he merely posed some discrete questions near the end of the session.* Under the circumstances, the police officers' presence and minimal involvement during the prosecutor's independent interrogation does not give rise to a single continuous interrogation (*cf. People v Fernandez*, 68 AD3d 469 [1st Dept 2009], *lv denied* 14 NY3d 800 [2010] [failure to provide the defendant with *Miranda* warnings before his initial statements did not preclude admission of the defendant's subsequent statements, despite continued presence of one detective, where there was lengthy passage of time between statements, location and interrogators were changed, and detective was not involved in questioning]).

Likewise, while defendant points out that, during the videotaped interview, the ADA used the suppressed statements, the ADA mentioned the statements only in passing and otherwise did not refer to them. In response, defendant merely acknowledged that he wrote the statements and signed one of them. Only then—after defendant essentially completed giving the ADA his version of what transpired—did the prosecutor show defendant the statements. Under the circumstances, it cannot be said that defendant was confronted with improperly elicited statements in order to elicit the videotaped statements.

In sum, we find no error in the court's refusal to suppress defendant's videotaped statement to the ADA, notwithstanding the suppression of prior statements to the investigating officers more than seven hours earlier. There was a "definite, pronounced break in the interrogation" (*Chapple*, 38 NY2d at 115; *see also People v Torres*, 143 AD2d 582, 586 [1st Dept 1988], *lv denied* 73 NY2d 897 [1989]), which was occasioned by a sufficient lapse of time and the re-administration of *Miranda* warnings; and the interrogation was done almost exclusively by the prosecutor, rather than the investigating officers, so that the videotaped statement was not tainted by the shortcomings that led to suppression of the first statements. Nor is there a basis for concluding that the earlier statement in any way "locked-in" defendant with respect to the contents of the second statements.

Accordingly, the judgment of the Supreme Court, New York County (Ruth Pickholz, J., at suppression hearing; Maxwell Wiley, J., at plea and sentencing), rendered June 17, 2009, convicting defendant of manslaughter in the first degree and

---

* The videotaped interrogation lasted approximately an hour.

criminal possession of a weapon in the third degree, and sentencing him, as a second violent felony offender, to an aggregate term of 32 years, should be affirmed.

ANDRIAS, J.P., FREEDMAN and GISCHE, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 17, 2009, affirmed.