■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK RICHARDSON, Appellant. [49 NYS3d 26]—

Judgment, Supreme Court, New York County (Richard D. Carruthers, J., at suppression hearing; Bruce Allen, J., at trial), rendered October 27, 2011, convicting defendant, after a jury trial, of murder in the second degree and robbery in the first and second degrees, and sentencing him, as a second felony offender, to an aggregate term of 25 years to life, unanimously affirmed.

On the afternoon of Friday, January 11, 2008, defendant and one or more accomplices robbed and killed the 69-year-old victim inside her apartment in the Wagner Houses, in Harlem. The body was discovered by the victim's daughter approximately two days later. The victim's cell phone was not found in the apartment, but cell phone records indicated that several calls had been placed from the phone to friends and relatives of defendant. Surveillance video revealed that defendant had entered and exited the victim's building several times during the morning and afternoon of January 11th.

On February 5, 2008, defendant agreed to accompany the police to the station for an interview. Defendant was not handcuffed and was told that he was free to leave. The police showed defendant a photo of the victim's body and said they wanted to ask him about her death, since they knew defendant often visited the building. The detectives advised defendant of his *Miranda* rights, which he waived in writing.

Defendant initially denied knowing the victim, but eventually gave an oral statement, which the detective wrote down and defendant signed. Defendant claimed to be at work during the day of January 11, but admitted that he and an acquaintance, Anthony Hall, went to the victim's apartment in the evening to collect a debt owed him. Once inside the victim's apartment, the acquaintance began to argue with the victim, then slammed her into the refrigerator. When defendant tried to intervene, the victim's wallet fell. Defendant retrieved the wallet, put it on a table, and said, "[I]t's not worth this for my money." Defendant maintained that he left the apartment while the acquaintance and the victim were still arguing.

Defendant refused to provide a DNA sample. An "I-Card" was issued to instruct any police officers who arrested defendant to obtain his DNA sample. On May 31, defendant was arrested on an unrelated charge. One of the detectives recovered defendant's cigarette butts and water cup for DNA testing.

On July 3, the medical examiner informed the detective on the case that defendant's DNA matched the DNA recovered from the victim's breast.

On the morning of July 10, defendant was arrested. At about 8:40 a.m., defendant was brought to an interview room, uncuffed, and given cigarettes. The police told him he was under arrest based on DNA evidence and other evidence obtained after he had given his first written statement on February 5th.

The police left the room for about an hour. Then, around 9:45 a.m., the detectives returned. The lead detective read defendant's February 5th statement in order to "solidify what he said the first time"; as the detective read, defendant nodded. The detective discussed the surveillance video footage and cell phone records.

Defendant said he stood by his written statement, whereupon the detective confronted him with the fact that the amylase from the victim's breast matched defendant's DNA. Defendant became "upset" and remarked: "[T]heoretically she could have been sitting on my lap and I could have been sucking on her titties." Defendant said: "[W]hat you got in the first statement is my statement and you are not getting anything else."

At that point, the lead detective read defendant his *Miranda* rights. At 10:25 a.m., defendant signed a *Miranda* waiver and said that he did not want to speak or to answer questions.

The lead detective left the room. At about 10:45 or 10:50 a.m., defendant was taken to a cell. One of the other detectives observed defendant with his head in his hands, saying: "I can't believe this is happening to me."

At about 11:20 a.m., detectives escorted defendant to the restroom. As they were walking back to the cell, defendant stopped and asked one of the detectives: "[H]ow serious is this? Am I going to do a lot of time for this?" The detective told him he was facing "a murder charge," adding that he was on "the video" and that the victim's phone showed calls to defendant's "family members." Defendant looked up and started to cry. The detective said he would listen to defendant if he wanted to "say something." Defendant replied: "[Y]eah, I want to talk."

At about 11:15 a.m., defendant was brought back to the interview room. The lead detective reissued the *Miranda* warnings, and defendant agreed to speak. Defendant made an oral statement, which the lead detective wrote down and defendant signed at 11:55 a.m. Defendant largely reiterated his February 5th written statement, but added that Hall was a "drunk," and defendant had lent him the $28 with the expectation of being paid back $30. Hall brought defendant to the victim's apartment for the "express purpose of getting the money." Defendant stated that while the acquaintance was arguing with the victim he noticed money in the victim's bra—the $30 he was owed. He told the victim that he wanted his money, and reached into her bra and grabbed it. The victim slapped defendant in the face, and defendant pushed her and left the apartment.

Defendant also added that someone named "John" or "Johnny" was present during the incident. Before defendant left, he saw Johnny grab the victim around the neck, after which the other acquaintance grabbed a silver object from the kitchen and started punching the victim. Defendant saw that the victim was bleeding, and realized the acquaintance had stabbed her.

Around 12:55 p.m., the detectives left while defendant stayed in the interrogation room. They occasionally returned to check on defendant and ask if he wanted to eat or use the restroom.

About five hours later, around 6:00 p.m., an assistant district attorney took a videotaped statement from defendant in the same interrogation room, in the presence of two of the detectives who had interrogated him earlier in the day. The ADA repeated the *Miranda* warnings to defendant, and defendant again waived his *Miranda* rights.

In the videotaped interrogation, defendant reiterated that he had lent $28 to his acquaintance with the understanding that the acquaintance would pay him back $30. Hall told defendant the victim had his money and the two went to the victim's apartment to retrieve it. Defendant stated that while Hall was arguing with the victim, he saw the money in the victim's blouse and took it. The victim "grabbed" defendant. He tried to push her away, at which point Johnny grabbed the victim by the neck, and Hall appeared to "punch[ ] her in the stomach." After, defendant observed a silver object in Hall's hand and realized that he had stabbed the victim. Defendant said "I'm out of her [sic]" and left.

Defendant acknowledged that he had been allowed to use the restroom and been given food, drink, and cigarettes following his arrest.*

The hearing court granted in part and denied in part defendant's suppression motion. The court declined to suppress defendant's February 5th statement, finding that he "freely accompanied" the detectives to the precinct and was not in custody.

The court suppressed defendant's initial oral and written statements after his arrest on July 10. The court credited the detective's testimony that he considered the pre-*Miranda* questioning a "review" and did not anticipate that defendant would be making a statement; still, the court reasoned that the detective should have read defendant his *Miranda* rights before reviewing defendant's February 5th statement and confronting him with the DNA, cell phone records, and other evidence.

The court suppressed defendant's post-*Miranda* statement to the lead detective, as well as the conversation between defendant and another detective as he was being escorted to the bathroom. The court reasoned that there had been an insufficient break between the earlier, unwarned statement to the lead detective and the subsequent statements to establish attenuation. Insofar as relevant to the appeal, the court ruled that the initial, 13-minute portion of defendant's videotaped statement to the ADA, made approximately five hours later, was attenuated from any illegal police conduct and thus admissible. That portion of the videotape included defendant's account of his actions on the date of the victim's death and refer-

---

* Defendant made another statement about 20 minutes after his videotaped statement, which the court admitted; however, any challenge to this ruling is moot, since this statement was not introduced at trial (*see People v Falcon*, 281 AD2d 368, 368 [1st Dept 2001], *lv denied* 96 NY2d 901 [2001]).

ences to the contents of his February 5th statement to the police. The court reasoned, inter alia, that defendant had been lawfully arrested; there was "no evidence of flagrant police misconduct"; the two initial interview sessions were "relatively brief; there was an interval of almost five hours between the conclusion of those interviews and the videotaped interview; and the ADA, rather than the detectives, conducted "the greater part of the questioning" on the video.

The court suppressed the remainder of the video because it contained references to defendant's suppressed statements to the detectives. We agree that the hearing court properly admitted the first 13 minutes of the videotaped statement, and now affirm. "[W]here an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a single continuous chain of events, there is inadequate assurance that the *Miranda* warnings were effective in protecting a defendant's rights, and the warned statement must also be suppressed" (*People v Paulman*, 5 NY3d 122, 130 [2005] [internal quotation marks omitted]). The following factors should be considered in determining whether there was a "definite, pronounced break in the interrogation to dissipate the taint from the *Miranda* violation": "the time differential between the *Miranda* violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the *Miranda* violation, such as the extent of the improper questioning; and whether, prior to the *Miranda* violation, defendant had indicated a willingness to speak to police" (*id.* at 130-131 [internal quotation marks omitted]).

Defendant's videotaped statement was made approximately five hours after the initial *Miranda* violation. Much shorter breaks have been found sufficient to dissipate the taint of a *Miranda* violation (*see e.g. People v White*, 10 NY3d 286 [2008], *cert denied* 555 US 897 [2008]). In addition, "defendant had demonstrated an unqualified desire to speak" (*People v Rodriguez*, 55 AD3d 351, 352 [1st Dept 2008], *lv denied* 12 NY3d 762 [2009]), seemed alert and relaxed in the video, and did not appear nervous or intimidated. Indeed, he was even "laughing on occasion."

Defendant had been Mirandized after his first encounter with the police concerning the case, on February 5. Further, the ADA—who had not participated in the earlier interrogation—was the sole questioner in the admitted portion of the video. Although two of the detectives who had conducted the

earlier interrogation were present, they did not participate in the questioning in the admitted segment. Notably, the court suppressed any references to the suppressed statements made earlier on July 11th, as well as the later portion of the video in which the detectives participated in questioning (*see People v Thompson*, 136 AD3d 429, 430 [1st Dept 2016], *lv denied* 27 NY3d 1075 [2016] [taint of *Miranda* violation was dissipated where Mirandized interrogation was conducted by "new interrogators" after "pronounced break of at least four hours," and "the original interrogator (was) merely present without participating"]; *People v Davis*, 106 AD3d 144, 154-155 [1st Dept 2013], *lv denied* 21 NY3d 1073 [2013] [while the interviews took place in the same location with the lead investigators present, the prolonged break and the administration of *Miranda* warnings by the ADA, who had not previously been involved in the interrogation of defendant, "signaled a change in the nature of the interrogation," as reflected in defendant's calm demeanor and willingness to provide information]). The prosecutor did not refer to defendant's suppressed statements in the initial 13 minutes of the videotaped interview—the only segment admitted into evidence.

Defendant made no pre-*Miranda* inculpatory statements. He placed himself on the scene—but he had already done so in his initial, February 5th statement, which was admitted. Defendant maintained throughout that Hall and/or Johnny committed the assault upon the victim, and he was merely present in the apartment to collect a debt owed. We therefore conclude that the first 13-minutes of the videotaped interrogation were sufficiently attenuated from the *Miranda* violation and properly admitted.

Neither defendant's invocation of his right of silence after his oral statement (*see People v Curry*, 287 AD2d 252, 253 [2001], *lv denied* 97 NY2d 680 [2001]), nor the other alleged improprieties regarding the suppressed statements require suppression of the videotaped statement. In any event, regardless of whether the court should have suppressed defendant's entire videotaped statement as unlawfully obtained, any error was harmless in light of the overwhelming evidence of guilt, including defendant's undisputedly admissible prearrest statement made on an earlier day, video surveillance footage, and compelling forensic evidence (*see People v Crimmins*, 36 NY2d 230, 237 [1975]).

The court properly rejected defendant's claim under *Brady v Maryland* (373 US 83 [1963]) regarding the People's delay in disclosing allegedly exculpatory material, which was disclosed

before trial, but at a time when, according to defendant, it was too "stale" to use. Even under the standard applicable where a defendant makes a specific request for the evidence at issue, there is no "reasonable possibility" that earlier disclosure of statements indicating that the offense happened on January 12 rather than January 11, 2008, or that persons other than the two alleged perpetrators participated in the murder, "would have changed the result of the proceedings" (*People v Fuentes*, 12 NY3d 259, 263 [2009]). As noted, there was overwhelming evidence, including the presence of defendant's DNA on the victim's body and other proof having no reasonable explanation other than defendant's guilt. The statement by defendant's accomplice that the incident occurred on January 12 was not material in light of the accomplice's later statements that the incident occurred on January 11, defendant's undisputedly admissible statement where he admitted taking money from the victim in her apartment on January 11, surveillance video showing defendant repeatedly taking the elevator up to the victim's floor of her apartment building over the course of many hours on that date, and the records of defendant's employer showing that defendant lied when he told the police he worked as scheduled on that date. In this case where the number of perpetrators was uncertain, the statements by others suggesting that various persons aside from defendant and his known accomplice might have also participated in the offense "were reconcilable with the trial testimony" (*see People v Buie*, 289 AD2d 140, 141 [1st Dept 2001], *lv denied* 98 NY2d 695 [2002]). The court also providently exercised its discretion in declining to permit defendant to elicit hearsay as a remedy for the delay in disclosure (*see id.*).

"Defendant's right of confrontation was not violated when an autopsy report prepared by a former medical examiner, who did not testify, was introduced through the testimony of another medical examiner" (*People v Acevedo*, 112 AD3d 454, 455 [1st Dept 2013], *lv denied* 23 NY3d 1017 [2014]). The report was not testimonial, since it "[did] not link the commission of the crime to a particular person" (*People v John*, 27 NY3d 294, 315 [2016]; *see People v Freycinet*, 11 NY3d 38, 42 [2008]). Concur—Sweeny, J.P., Renwick, Mazzarelli, Manzanet-Daniels and Feinman, JJ.